UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KEITH POWELL,                                    )
                                                 )
      Plaintiff,                            )
                                                 )       No. 23-cv-14098
      v.                                    )
                                                 )       Judge April M. Perry
VILLAGE OF HOMEWOOD, *et. al.*,                  )
                                                 )
      Defendants.                           )

## OPINION AND ORDER

Plaintiff Keith Powell ("Plaintiff") brings this case against the Village of Homewood ("Village"), Robert Misner ("Misner"), and Craig Sline ("Sline") (collectively, "Defendants") under 42 U.S.C. § 1983 ("Section 1983"), Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 1981 ("Section 1981"), 42 U.S.C. § 1986 ("Section 1986"), and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 ("ICRA"). Plaintiff's remaining claims[1] include:

- **Count I** against the Village for race and national origin discrimination in violation of Section 1983, under the Fourteenth Amendment's Equal Protection Clause;

- **Count II** against the Village for race and national origin discrimination in violation of Title VI;

- **Count III** against the Village and Sline for race discrimination in violation of Section 1981;

- **Count V** against the Village for disparate treatment and disparate impact discrimination in violation of ICRA;

---

[1] The Court previously dismissed Counts IV, X, XI, XII, XIII, and XIV, as well as all claims against Denise McGrath, Eric Bujak, and Kyle Hoefler. Doc. 61.

1

- **Count VI** against Misner and Sline for First Amendment retaliation in violation of Section 1983;

- **Count VII** against Misner and Sline for civil conspiracy;

- **Count VIII** against the Village for a policy and practice of unconstitutional policing under Section 1983, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978); and

- **Count IX** against Sline for conspiracy in violation of Section 1986.

Before the Court is Defendants' motion for summary judgment on all remaining claims and a motion to strike. Doc. 111, Doc. 142. For the reasons set forth below, the Court grants Defendants' motion for summary judgment, and denies the motion to strike.

## BACKGROUND[2]

Plaintiff is an African American resident of Homewood, Illinois who lives with his wife and three adult children. Doc. 150-1 ¶ 4. Shortly after midnight on September 25, 2022, Plaintiff awoke to an unknown man (later identified as Kyle Hoefler) banging on Plaintiff's front door. *Id.* ¶¶ 18, 29. Plaintiff instructed Hoefler to leave, but Hoefler kept banging on the door. *Id.* ¶ 20. Plaintiff then asked his wife to call 911 and Plaintiff retrieved his gun. *Id.* ¶¶ 21-22. Plaintiff returned downstairs where he informed Hoefler that he had a firearm, but Hoefler persisted in banging on his door. *Id.* ¶ 22. Plaintiff's wife reported to the 911 operator that "someone was banging on the door and they do not know who it may be and that there were no vehicles out front." *Id.* ¶ 23.

---

[2] The Court derives the facts in this section from the Amended Joint Statement of Undisputed Material Facts. Doc. 150-1. The Court views the facts in the light most favorable to Plaintiff, "giving [him] the benefit of conflicts in the evidence and reasonable inferences from the evidence." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924–25 (7th Cir. 2020).

Sergeant Sline of the Homewood Police Department ("HPD") was the first officer to arrive at the scene and at the time was wearing a body worn camera which was properly activated and captured the subsequent events. *Id.* ¶¶ 6, 15-16; Doc. 119.[3] Upon his arrival, Sline observed Hoefler sitting on Plaintiff's porch railing wearing a golf hat, sunglasses above his visor, shorts, and a polo shirt. Doc. 150-1 ¶ 28. Sline asked Hoefler what he was doing there, and Hoefler responded that he was hanging out at his friend's house. *Id.* ¶ 29. Sline told Hoefler that the people who lived in the house did not know him. *Id.*

Plaintiff opened his door after Sline arrived. *Id.* ¶¶ 24-25, 30. Plaintiff was in a highly agitated state and yelled that he didn't know Hoefler and for Hoefler to get off his front porch. *Id.* ¶¶ 31-32. Sline assured Plaintiff that Sline was handling the matter. *Id.* ¶ 33. Hoefler then left Plaintiff's front porch, and Plaintiff exited his house with his loaded gun in his hand and threatened to "blow [Hoefler's] fucking head off." *Id.* ¶ 34, 38-39. Sline immediately drew his gun, pointed it at Plaintiff, and instructed Plaintiff to put down his weapon. *Id.* ¶ 40. Plaintiff placed his gun on the porch ledge next to him and continued threatening to kill Hoefler. *Id.* ¶ 41. Plaintiff stated "Give me his fucking name and address … Please do … Cause I have every fucking right to kill his punk ass." *Id.* Sline responded, "No you don't," and Plaintiff replied, "Yes I do." *Id.* Sline then stated "Obviously you should not own a firearm sir." *Id.*

At some point during the incident, Sline asked dispatch if Plaintiff had a Firearm Owner's Identification ("FOID") card, which dispatch confirmed. *Id.* ¶¶ 5, 54. Sline also called for backup because he could not de-escalate Plaintiff. *Id.* ¶ 55. A second officer eventually arrived at the scene with an AR-15, and Plaintiff exclaimed that he had one of those upstairs as well. *Id.* ¶ 56.

---

[3] Sline's responsibilities included patrol supervision, incident response, and incident investigation. Doc. 150-1 ¶ 6.

Sline continued questioning Hoefler away from Plaintiff's house and ultimately concluded that Hoefler was intoxicated. *Id.* ¶¶ 28, 46. Sline's conclusion was based on Hoefler's mistaken belief he was at a friend's home, the odor of alcohol, Hoefler's admission that he had too much to drink, and Hofler's mannerisms, slurred speech, bloodshot eyes, and unsteady gait. *Id.* ¶ 46. Hoefler was not arrested and was given a ride home by police. *Id.* ¶ 48. Plaintiff was also not arrested, charged with a crime, or touched by the police during the incident. *Id.* ¶ 68. Plaintiff made complaints during the police response that Hoefler was not arrested because Hoefler was White. *Id.* ¶ 43. Sline has testified that he believed he lacked probable cause to arrest Hoefler for trespassing, disorderly conduct, or disturbing the peace due to Hoefler's intoxication. *Id.* ¶¶ 44, 49-50.

Upon returning to the HPD, Sline wrote a Clear and Present Danger Report under the Illinois FOID Act so that the Illinois State Police could determine whether Plaintiff should be allowed to retain his FOID card. *Id.* ¶¶ 58, 61. The FOID Act requires law enforcement officers to report an individual who has a FOID card who presents a clear and present danger. *Id.* ¶¶ 53, 58; 430 ILCS 65/8.1 (noting that if a person presents a clear and present danger a law enforcement "shall" notify the Illinois State Police). The statutory definition of a clear and present danger includes "a person who demonstrates threatening physical or verbal behavior such as violent, suicidal, or assaultive threats, actions or other behaviors as determined by a physician, clinical psychologist, qualified examiner, school administrator or law enforcement official." Doc. 150-1 ¶ 60; 430 ILCS 65/1.1. Sline's supervisor, Deputy Chief Misner, [4] concurred in the filing of this report. Doc. 115-18. The report was filed on September 26, 2022. Doc. 115-18. The Illinois State Police later revoked Plaintiff's FOID card. Doc. 150-1 ¶ 66.

---

[4] Misner's responsibilities included reviewing arrests and reports. Doc. 150-1 ¶ 7.

Plaintiff filed a complaint with HPD about Sline's conduct sometime after the incident. *Id.* ¶ 70. Misner sent a memorandum of his findings to HPD's Chief of Police, concluding that Sline had not engaged in any misconduct. *Id.* On November 1, 2022, Misner sent a letter to Plaintiff stating that HPD found no misconduct and advising Plaintiff of his right to have the matter investigated by the Cook County State's Attorney or the Federal Bureau of Investigation. *Id.* ¶ 71.

Other than Plaintiff's interactions with HPD officers on September 25, 2022, Plaintiff only interacted with the HPD on two other occasions in 2019 and approximately 2020 or 2021. *Id.* ¶ 78. The parties dispute the nature of both incidents, which involved Plaintiff's sons. Doc. 130 ¶¶ 72-77.

## LEGAL STANDARD

Summary judgment is proper when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, the party that bears the burden of proof must present facts showing there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor, this

5

obligation does not extend to drawing inferences that are supported only by speculation or conjecture. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

**ANALYSIS**

### I.      Summary Judgment Briefing

The Court begins with a discussion of the filings submitted by both parties, which were – to put it mildly – extremely difficult to follow. Despite Local Rule 7.1's mandate that briefs be no more than fifteen pages, the Court allowed both parties to greatly exceed the page limits for their briefs. Doc. 110 (permitting Defendants to file a thirty-five-page motion for summary judgment), Doc. 134 (permitting Plaintiff to file a forty-five-page response), Doc. 149 (permitting Defendants to file a thirty-eight-page reply). Making their lengthy briefs digestible should have been at the forefront of concern for both parties, but unfortunately both parties failed to file any table of contents or table of cases in their responsive briefs in violation of Local Rule 7.1. Doc. 129; Doc. 146.

There also were a multitude of Local Rule 56.1 violations.[5] Local Rule 56.1 is not a mere formality; it is necessary "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotations omitted). As the Seventh

---

[5] This is neither counsel's first attempt at summary judgment briefing. Other Courts in this district have already taken the time to address attorney Danielle Pinkston's lack of compliance with Local Rule 56.1. *See Royston v. DeJoy*, No. 1:18-CV-01697, 2021 WL 4502217, at *4-5 (N.D. Ill. Sept. 30, 2021); *Jackson v. Nw. Mem'l Hosp.*, No. 19-CV-4924, 2023 WL 5934894, at *2-3 (N.D. Ill. Sept. 12, 2023). And attorney Lori Vanderlaan has worked on a substantial number of summary judgment motions. *See, e.g., WSP USA Inc. v. Nautilus Ins. Co.*, No. 19-CV-6731, 2023 WL 3226195 (N.D. Ill. May 2, 2023); *Lauten v. Vill. of Lisle*, No. 18-CV-05943, 2022 WL 4465968 (N.D. Ill. Sept. 26, 2022); *Johnson v. Joliet Junior Coll.*, No. 06-CV-2135, 2009 WL 674357 (N.D. Ill. Mar. 13, 2009).

6

Circuit has evocatively noted, "Judges are not like pigs, hunting for truffles buried in briefs." *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Thus, the district court has the discretion to demand strict compliance with Local Rule 56.1. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings.").

Under Local Rule 56.1, both parties may submit statements of material fact and must submit responses to their opponent's statements of fact. L.R. 56.1. In an effort to streamline matters, this Court's standing order also requires the parties to propose a joint statement of undisputed material facts. Each asserted fact "must be supported by citation to the specific evidentiary material, including the specific page number, that supports it" and "should not contain legal argument." L.R. 56.1(d)(2), (4). Furthermore, to properly dispute an asserted fact, responses "must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). Responses "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made[,]" and "may not assert legal arguments except to make an objection including objections based on admissibility, materiality, or absence of evidentiary support." L.R. 56.1(e)(2).

Here, Defendants submitted a Statement of Material Facts, which Defendants then amended three times after the filing of Defendants' opening brief. Doc. 112; Doc. 121; Doc. 127; Doc. 150-2. Plaintiff filed a response to Defendants' proposed facts just once, prior to the last

7

amendment. Doc. 130. Plaintiff additionally filed its statement of facts, Doc. 131, to which

Defendants filed a response. Doc. 144. The parties also jointly submitted an agreed statement of

undisputed facts, which was amended once. Doc. 126; Doc. 150-1. Because the amended joint

statement of undisputed facts was filed after all of the substantive briefing was complete, none of

the briefing references that document. As a result of this chaos, the Court asked the parties for a

chart noting which statements of facts should be considered in resolution of the summary

judgment motion and which should be disregarded. Doc. 151. The parties directed the Court to

rely on Doc. 130, Doc. 131, Doc. 144, Doc. 150-1, and Doc. 150-2. Doc. 154. But on closer

inspection, many of the documents this Court was told to rely on contain internal references to

documents the Court was told disregard.[6]

But determining which statements of facts to use is not the only problem, because the

statements of facts themselves are also plagued by issues. For example, Plaintiff's 56.1(b)(3)

Additional Facts begins with an outline of exhibits labeled A through U. Doc. 131 at 1. Attached

are twenty unlabeled exhibits,[7] totaling almost 1,500 pages. These exhibits are attached in

random order and do not contain consistent labels.[8] To make matters worse, some of the exhibits

are missing with the notation "actual footage to be filed on a later date" – which never occurred.[9]

---

[6] For example, Doc. 150-1 repeatedly references "Defendants' Second Amended Statement of Material
Facts in Support of Defendants' Motion for Summary Judgment," which is Doc. 127. However, the
parties instructed the Court in Doc. 154 to disregard Doc. 127. Similarly, Doc. 150-2 includes references
to "Agreed Joint Statement of Material Facts," Doc. 126, which the Court was instructed to disregard in
Doc. 154.

[7] The Court takes judicial notice of the fact that U is the twenty-first letter of the alphabet, not the
twentieth.

[8] For example, Doc. 131-2 is labeled as both Exhibit Q and Exhibit F. Doc. 131-7 is unlabeled.

[9] Plaintiff asserted that the following would be filed on a later date: Doc. 131-1 ("Plaintiff's Exhibit J Eric
Bujak's Body Worn Camera Footage"), Doc. 131-3 ("Plaintiff's Exhibit O Footage #1 of John Drux and
Kathy Coluzzi entering Butler' s Garage"), Doc. 131-4 ("Plaintiff's Exhibit N Footage #1 of John Drux

Moreover, many of Plaintiff's pinpoint citations fail to clearly note which exhibit is being referenced.[10] These missteps are especially disappointing given that Plaintiff's counsel requested and received two extensions of time to file Plaintiff's responsive documents. Doc. 123, Doc. 125.

Plaintiff's 56.1(b)(2) Responses are also problematic. Local Rule 56.1(e)(3) requires conciseness in a party's response to statements of facts. Many of Plaintiff's responses are verbose to the point of being nonsensical.[11] To illustrate the issue, Defendants asserted as a proposed fact that Sline reported his observations of Plaintiff in the Clear and Present Danger Report and included a direct quotation from said report. Doc. 130 ¶ 62. Despite the straightforward nature of the statement – which goes to Sline's observations as memorialized in a report – Plaintiff's response is a three-page breakdown of Plaintiff's perception of the incident and his disagreement with the report, the HPD Police Chief's perceptions of the incident, and testimony regarding Sline's recollections from the incident. *Id.* at 27-30. As another example, Defendants assert as a proposed fact the lack of investigation and statistical evidence presented by Plaintiff on the issue of Village police officers being biased towards African Americans. *Id.* ¶ 80. In response, Plaintiff cites back to another answer (four pages in length) which tangentially discusses police vehicles driving past Plaintiff's home more frequently after the incident and whether Hoefler was actually intoxicated during the incident. *Id.* at 7-11. Plaintiff's response then adds another four-page narrative of the Police Chief's testimony on demographic information and department complaints, Misner's testimony on department complaints, and Sline's testimony regarding his

---

and Kathy Coluzzi entering Butler's Garage"), Doc. 131-15 ("Plaintiff's Exhibit G Craig Sline's Body Worn Camera Footage").

[10] For example, Doc. 131 ¶¶ 11-12, 15-16, 19, and 22-30 reference the exhibits by description and not exhibit letter (or number). Plaintiff cites to no exhibit for ¶ 2.

[11] *See, e.g.*, Doc. 130 ¶¶ 14, 35, 57, 62, 69, 72, 80.

practices of arresting versus giving individuals rides home. *Id.* at 42-46. It also contains the statement "If Plaintiff has not presented any information or statistical evidence, it is because the defendants have not tendered it." *Id.* at 42. Such longwinded responses are not only unhelpful, but noncompliant with the Local Rules.[12]

Plaintiff's noncompliant responses can result in an admission to Defendants' 56.1(a)(2) Facts. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."). Defendants have filed a motion to strike Plaintiff's noncompliant responses altogether. *See* Doc. 142. Instead, the Court will consider Plaintiff's responses only to the extent they contain some citation to relevant evidence in the record that can be fairly read to dispute Defendants' asserted facts.[13] To the extent Plaintiff's answers to material facts are irrelevant, unintelligible, or contain no citations to record evidence, the corresponding proposed fact will be deemed admitted.

## II. Merits of Summary Judgment

### A. Standing

Turning to the merits of Defendants' motion for summary judgment, the Court begins with the question of standing. Article III of the Constitution limits the jurisdiction of the federal

---

[12] Although in some places Plaintiff is too lengthy, in others Plaintiff is not nearly lengthy enough. For example, Plaintiff fails to provide any explanation or citation for why he denied paragraph 52. *See* Doc. 130 at 22.

[13] Nor are Defendants' filings a model of Local Rule 56.1 compliance, and the Court will treat instances where Defendants fail to cite specific evidentiary material in response to a proposed fact the same way as it treats Plaintiff's. For example, in response to paragraphs 33, 37 and 38, Defendants broadly cite to "Plaintiff's Exhibit K" or "Exhibit K" without any pincite. Doc. 144 at 15, 17-19. Defendants additionally fail to cite to any pincite for "Plaintiff's Exhibit P," which appears to be Emails to/from Detective Sergeant Tom Johnson. *Id.* at 19.

courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The requirement of standing derives from this provision and has three elements: plaintiff must have (1) a concrete and particularized injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "As the party invoking the court's jurisdiction, the plaintiff bears the burden of establishing the elements of standing." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020). At summary judgment, a plaintiff must supply evidence of specific facts that "taken as true, show each element of standing." *Id.* at 286. This showing exceeds what Plaintiff would be required to show at the pleading stage, where "a plaintiff may demonstrate standing by clearly pleading allegations that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in plaintiff's favor." *Id.* at 285. Standing is jurisdictional, and without standing the case must be dismissed. *See United States v. Hays*, 515 U.S. 737, 742 (1995) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." (cleaned up)).

Here, Defendants challenge Plaintiff's standing to bring claims to the extent Plaintiff's claims are based on the "injury" that HPD failed to arrest Hoefler on September 22, 2026. Defendants are correct that Plaintiff lacks standing to assert injury related to the failure to arrest or prosecute a third-party. *See Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973) (holding that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). But the non-prosecution of Hoefler is not the only basis for Plaintiff's claims. The basis for Plaintiffs' claims also includes a lack of equal protection under the law, which is alleged to have occurred when Plaintiff requested aid from law enforcement and did not receive assistance because of his race and national origin. Although there is generally no right to

11

governmental aid, an exception arises if the state "selectively den[ies] its protective services to certain disfavored minorities" in "violat[ion of] the equal protection clause." *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 197 n. 3 (1989); *see also Nabozny v. Podlesny*, 92 F.3d 446, 456 n. 7 (7th Cir. 1996); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("Discrimination in providing protection against private violence could of course violate the equal protection clause of the Fourteenth Amendment."). Plaintiff also alleges a distinct injury based upon the fact that his FOID card was taken away following the HPD's Clear and Present Danger Report to the Illinois State Police. These injuries are sufficient to confer Article III standing for Plaintiff's claims.

### B. Section 1983 Equal Protection Claim (Count I)

The Court next considers Plaintiff's claim against the Village for race and national origin discrimination under Section 1983. A cause of action may be brought under Section 1983 against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. In *Monell*, the Supreme Court held that municipalities are "persons" who may be sued under Section 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). That said, the Supreme Court further held that "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. A constitutional deprivation may be attributable to a municipality only "when execution of a government's policy or custom inflicts the injury." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (internal citation omitted). "A local government unit's unconstitutional policy or

12

custom can be shown by: (1) an express policy causing the loss when enforced; (2) a widespread practice constituting a custom or usage causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (internal quotations omitted).

Here, Defendants argue that they are entitled to summary judgment on Count I because Plaintiff is attempting to hold the Village liable under a *respondeat superior* theory. Plaintiff counters that he "does not assert a pure vicarious-liability claim," and the claim instead "alleges that the Village of Homewood—acting through its police officers and supervisory officials— denied Plaintiff equal protection and engaged in racially discriminatory enforcement under color of state law." Doc. 129 at 12. This is, however, a theory of municipal liability based upon the Village having employed tortfeasors.[14] The caselaw is quite clear that "municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents." *Eversole v. Steele,* 59 F.3d 710, 715 (7th Cir. 1995).

Plaintiff has not pointed to any evidence in support of Homewood having an express policy of equal protection violations, a widespread practice of equal protection violations, or a person with final policymaking authority causing Plaintiff's alleged equal protection violation. Plaintiff's response brief argues broadly that "Homewood's discriminatory response reflected broader customs, practices, and supervisory approval." Doc. 129 at 12. Plaintiff argues specifically that the Clear and Present Danger Report was approved by Misner, who was a supervisory official, and that the Chief of Police agreed in a deposition after having watched the body-worn camera footage that Sline's actions were appropriate. *Id*. None of these things

---

[14] In fact, Plaintiff's heading in its argument section declares that "Plaintiff Has a Viable Action Against Homewood For Claims Alleged Under § 1983 Based On Respondeat Superior." Doc. 129 at 11.

establishes an explicit policy by the HPD to discriminate based upon race.[15] Nor do these facts demonstrate a widespread pattern or practice of equal protection violations, because all of the facts pointed to by Plaintiff involve the single alleged constitutional violation suffered by Plaintiff. "[I]t is clear that a single incident – or even three incidents – do not suffice" to establish a widespread custom or practice for the purposes of establishing municipal liability. *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014). Finally, the facts do not establish that a person with final policymaking authority caused Plaintiff's injury. While it is true that Misner approved both Sline's incident report and Clear and Present Danger Report, there is no evidence that Misner, a Deputy Chief, had final policymaking authority for the Village. Nor is there evidence that the Chief of Police knew about or had any involvement in Plaintiff's constitutional injury at the time it occurred.[16]

Because Plaintiff has explicitly argued that the Village is liable for Count I under a *respondeat superior* theory, and further points to no fact or law that would establish a valid basis for municipal liability, summary judgment in favor of the Village is appropriate.

### C. *Monell* Claim (Count VIII)

Plaintiff's free-floating *Monell* claim in Count VIII also fails. It frankly is unclear what Plaintiff is attempting to allege in Count VIII – the complaint discusses at length numerous

---

[15] To the contrary, the parties agree that HPD's written policies prohibit discrimination and bias in policing. Doc. 150-1 ¶ 12.

[16] Plaintiff states that "a reasonable jury could find that [Misner's] approval constituted ratification by a final policymaker," but cites no facts or law that Misner was a final policymaker. Doc. 129 at 35. Whether an official has final policymaking authority "is a question of *state law*" which "will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995). To the extent Plaintiff believes that the Deputy Chief of the HPD had such authority, the onus was on Plaintiff to cite either fact or law in support of such position. *Schaefer v. Universal Scaffolding & Equipment, LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.")

unconstitutional policies and practices supposedly engaged in by HPD, including improper searches, seizures, and uses of force, officer dishonesty, and a police "code of silence." Doc. 1 ¶ 146. Simply put: there is no evidence that any of those things happened to Plaintiff. Plaintiff's responsive brief drills down somewhat better on what may have actually happened to Plaintiff, alleging violations of the Equal Protection Clause, First Amendment, and Second Amendment. Setting aside for the moment whether Plaintiff can show that any of his constitutional rights were violated, Plaintiff has not properly pointed to any facts that would establish municipal liability. Again, Plaintiff does not point to any HPD express policy that is problematic under the Equal Protection Clause, First Amendment, or Second Amendment. Nor does Plaintiff show that any final policymaker at HPD was responsible for any of Plaintiff's purported constitutional injuries. That leaves only a pattern or practice of constitutional violations as a potential basis for municipal liability.

In demonstrating a widespread pattern or practice of unconstitutionality, a plaintiff must point to a "*specific* pattern or series of incidents." *Nelson v. City of Chicago*, 992 F.3d 599, 607 (7th Cir. 2021) (emphasis in original). The comparators must be "similar" to the violation suffered by the plaintiff. *Dean v. Wexford Health Sources, Inc*., 18 F.4th 214, 234 (7th Cir. 2021). Moreover, "a few sporadic examples of improper behavior" will not do. *Flores v. City of South Bend*, 997 F.3d 725, 733 (7th Cir. 2021).

Here, Plaintiff has alleged that the HPD engages in "selective enforcement favoring white individuals, treating Black residents as suspects rather than victims, and discretionary escalation through administrative enforcement tools for blacks and turning a blind eye to the unsavory and illegal actions of whites." Doc. 129 at 35. Plaintiff also alleges that HPD failed to train officers "on racially neutral exercises of discretion, proper use of the CPD process, and avoiding

retaliatory responses to citizen complaints." *Id*. As factual support for these unconstitutional practices, Plaintiff points to four prior incidents. The facts are disputed, but the Court will take Plaintiff's version as true for the purposes of this motion. *See* Doc. 130 ¶¶ 72-77. As best the Court can discern, in one such incident, Plaintiff's son was urinating on someone's front sidewalk and was charged with disorderly conduct. *Id*. ¶¶ 76-77. In a second incident, HPD refused to charge an alleged burglary committed by a White former tenant that had been reported by a Black homeowner. Doc. 144 ¶¶ 19, 32-39. In a third incident, Plaintiff's wife was involved in a neighbor dispute involving a dog which ended with the neighbor being cited with a leash violation. *Id*. ¶ 20. In a fourth incident, Plaintiff's teenage son was chased from a park by White teenagers who believed Plaintiff's son was videotaping them, and no one was charged with a crime. Doc. 130 ¶ 72. There are several problems with Plaintiff's comparators. First, apart from the alleged burglary in which a White individual was not charged, none even remotely evidence "selective enforcement favoring white individuals." Second, apart from the incident in which Plaintiff's son was charged with disorderly conduct for having publicly urinated, none involve "treating Black residents as suspects rather than victims." Third, none of the incidents involve "discretionary escalation through administrative enforcement tools" or any alleged retaliation by HPD against Black residents. Nor do any of Plaintiff's comparators involve retaliation for the exercise of First Amendment rights or Second Amendment rights. In summary, Plaintiff has not shown a *specific* pattern of *similar* incidents to what he claims happened to him. Rather, he has provided a few anecdotal examples that differ significantly both from each other and from what happened to him. For these reasons, Plaintiff has not established any viable *Monell* claim and the Village is entitled to summary judgment on Count VIII.

### D. Title VI Claim (Count II)

16

The Court next considers Plaintiff's claim against the Village for race and national origin discrimination under Title VI. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI was "enacted pursuant to Congress' spending power … [and operates by] conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds." *Parker v. Franklin Cnty. Cmty. Sch. Corp.,* 667 F.3d 910, 917 (7th Cir. 2012).

Defendants previously argued in their motion to dismiss that no relief under Title VI was available against the Village because (1) a municipality is not itself a "program or activity" even if it receives federal assistance, (2) no federally-funded "program or activity" out of which Plaintiff's discrimination claim arose was identified in the complaint, and (3) Title VI provides no cause of action for claims based on disparate impact. Doc. 61 at 6-7. The Court found resolution of these arguments premature, Doc. 61 at 6, and Defendants now raise similar arguments at summary judgment.

Despite having been given the opportunity in discovery to develop the factual record in support of a Title VI claim, Plaintiff has not done so. Most obviously, Plaintiff still has not identified any federally funded program or activity out of which his claim arises. Plaintiff argues, without any citation, that HPD "receives federal law enforcement funding, grants, equipment, and training." Doc. 129 at 23. This certainly could be true. But "[s]ummary judgment is the put up or shut up moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Instead of citing any facts or law in his responsive brief, Plaintiff simply states that "whether and

17

to what extent Homewood's police department receives federal funding is a fact-intensive question inappropriate for resolution at summary judgment." Doc. 129 at 23. Not true. Summary judgment is exactly the time to determine whether there are any facts to support a claim. Proof of federal funding is a vital element of a Title VI claim. Because Plaintiff has failed to point to even the most basic of facts in support of his Title VI claim, summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 317 (1986) (holding that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### E. First Amendment Retaliation Claim (Count VI)

In Count VI, Plaintiff alleges a First Amendment retaliation claim against Sline and Misner. To establish a First Amendment retaliation claim, a plaintiff must show that he (1) engaged in activity protected by the First Amendment; (2) suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor in the Defendants' decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). When a defendant makes a showing that there is a non-protected basis for the adverse action, the burden shifts back to the plaintiff "to present evidence demonstrating a material issue of fact as to pretext." *Bless v. Cook County Sheriff's Office*, 9 F.4th 565, 573 (7th Cir. 2021) (internal quotation omitted).

In this case, Plaintiff claims that his First Amendment activity included his criticizing the officers' handling of the Hoefler incident, "questioning their failure to arrest or investigate Hoefler, and expressing fear and frustration over the lack of police protection." Doc. 129 at 27. This is sufficient to show that Plaintiff engaged in activity protected by the First Amendment. Plaintiff further argues that his deprivation included the HPD's filing of the Clear and Present

Danger Report, which resulted in the loss of his FOID card. The Court agrees this is adequate to establish a deprivation that would likely deter future First Amendment activity. However, Plaintiff's case falls apart on the third prong: that the First Amendment activity was a motivating factor in the decision to take the retaliatory action. Defendants have presented undisputed evidence that the filing of the Clear and Present Danger Report was non-discretionary. Specifically, the parties have agreed that the FOID Act requires law enforcement officers to report an individual who "demonstrates threatening physical or verbal behavior such as violent, suicidal, or assaultive threats." Doc. 150-1 ¶¶ 53, 58, 60. Threats are, of course, not protected by the First Amendment. *See Counterman v. Colorado*, 600 U.S. 66, 72 (2023) (noting that true threats of violence "lie outside the bounds of the First Amendment's protection" and that "a statement can count as such a threat based solely on its objective content."). And the parties have further agreed that Plaintiff did make violent and assaultive threats, including insisting that he had the right to kill Hoefler and asking for Hoefler's name and address "[c]ause I have every fucking right to kill his punk ass." Doc. 150-1 ¶ 41. Based upon this, Plaintiff must present some evidence that Defendants' explanation for the Clear and Present Danger Report was pretextual. Plaintiff has not done so. Instead, Plaintiff suggests that he was under stress and frustrated when he made the threats, and therefore they should not have been perceived as credible. To be clear: the undisputed evidence shows that Plaintiff brought a loaded gun outside his home and repeatedly threatened to kill Hoefler with it. The fact that someone else may have perceived the situation differently (although after watching the body camera footage the Court frankly doubts it) is not evidence of pretext. Pretext "involves more than just faulty reasoning or mistaken judgment…it is a lie, specifically a phony reason for some action." *Milliman v. County of McHenry*, 893 F.3d 422, 433 (7th Cir. 2018). Plaintiff has presented no evidence of pretext, or

19

any other reason to believe that Plaintiff's protected First Amendment activity was a motivating factor in the Clear and Present Danger Report.[17] Therefore, Defendants are entitled to summary judgment on Count VI.

### F. Section 1981 Claim (Count III)

Plaintiff alleges in Count III a Section 1981 claim against the Village and Sline. As a preliminary matter, the Court notes that a Section 1981 claim cannot be brought against state actors, and therefore the Court interprets this claim as a one brought under Section 1983 for a violation of rights protected by Section 1981. *See Campbell v. Forest Preserve Dist. Of Cook County, Ill*., 752 F.3d 665, 670 (7th Cir. 2014). Turning to the underlying factual allegations supporting the claim, Plaintiff alleges that he was denied "the full and equal benefit of the state criminal laws and like punishment" based upon the HPD's refusal to prosecute Hoefler. Doc. 1 ¶¶ 89-93.

To prove a claim under Section 1981, a plaintiff must establish (1) he is a racial minority; (2) intentional discrimination by defendant on account of race; (3) and that the discrimination concerned an activity listed within Section 1981, which includes the right to make and enforce contracts, to sue, be parties, give evidence, and the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens. *See* 42 U.S.C. § 1981; *Morris v. Office Max, Inc*., 89 F.3d 411, 413 (7th Cir. 1996). This case obviously does not involve the right to make or enforce a contract, sue, be a party, or give evidence. The Court therefore interprets Plaintiff's claim as involving the "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981.

---

[17] The Court notes that Sline told Plaintiff he "should not own a firearm" immediately after Plaintiff insisted to Sline that Plaintiff had a right to kill Hoefler. Doc. 150-1 ¶ 41.

20

The problem with Plaintiff's theory of liability is discussed above, in the Court's discussion of standing. To the extent Plaintiff's only alleged injury under Section 1981 is the non-prosecution of Hoefler, he has no standing to bring a claim for relief. *See Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973). No citizen – of any race – has the right to demand a criminal prosecution of a third party. To the extent Plaintiff alleges more generally a Section 1981 claim based upon unequal police responses between Black and White citizens, the lack of any evidence in support of such theory are discussed both above (with respect to the lack of any relevant pattern and practice evidence) and below (with respect to the lack of intentional discrimination on account of race and national origin). In short, Defendants are entitled to summary judgment on Count III.

### G. Race and National Origin Discrimination Claims (Counts V, IX)

Counts V and IX involve different species of race and national origin discrimination. Specifically, Count V alleges a disparate treatment claim against the Village in violation of ICRA, Doc. 1 ¶¶ 113-120,[18] and Count IX alleges that Sline engaged in a conspiracy to deprive Plaintiff of equal protection of the laws, *id*. ¶¶ 150-160. Both disparate treatment claims and equal protection claims require a showing of intentional discrimination. *See Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (discriminatory intent showing required for disparate treatment claim); *Greer v. Amesqua,* 212 F.3d 358, 370 (7th Cir. 2000) (discriminatory intent showing required for equal protection violation claim). Similar to a First Amendment retaliation claim, if a defendant provides a nondiscriminatory reason for its action, the plaintiff must provide some evidence that the defendant's proffered reasoning should be disbelieved. *See Swetlik*, 738 F.3d

---

[18] Although the complaint also alleges a claim for disparate impact, Plaintiff asserts in his summary judgment brief that he is no longer bringing a disparate impact claim. Doc. 129 at 24.

818, 829 (noting that while a court must assume the truth of the non-moving party's evidence on summary judgment, speculation and conjecture do not create a genuine dispute of fact).

The Court notes first that Plaintiff's theory of discrimination is extremely amorphous. For example, Plaintiff does not allege that he was subjected on the basis of race or national origin to an improper search, seizure, arrest, use of force, interrogation, or arrest. Nor does Plaintiff allege that the HPD did not respond to his 911 call or remove from Plaintiff's house the man who had been causing the disturbance. Plaintiff does not like *how* the HPD resolved the incident, specifically that they did not arrest and prosecute Hoefler. But as already noted, a failure to arrest does not create a cognizable injury. Instead, Plaintiff argues generally that he received "less protection" and "harsher treatment" from HPD than a White resident would have. Doc. 129 at 18. But Plaintiff points to no facts that would establish either theory of discrimination.

The Court begins with Plaintiff's allegation that he received "less protection" than a White Homewood resident. To begin with, Plaintiff provides no facts that indicate that any White resident who called the police about a stranger knocking on their door in the middle of the night has received a different and better HPD response than Plaintiff. Indeed, Plaintiff provides no evidence at all about how any White crime victims in Homewood are treated, which is fatal to a claim that Black residents are treated worse than White residents. At most, Plaintiff points to two historical instances where Black residents asked unsuccessfully for a crime to be prosecuted. These anecdotes were factually distinct from Plaintiff's experience and say nothing about whether others of a different race receive more "protection" from HPD.[19] Moreover, Plaintiff has

---

[19] On the facts presented by Plaintiff with respect to both incidents, it is unclear that probable cause even existed for an arrest. With respect to the incident where Plaintiff's teenage son was chased out of a park by other teenagers, Plaintiff seems to acknowledge that his son was not physically touched or subjected to any threats. Doc. 130 at 8. With respect to the burglary incident, Plaintiff quotes at length from a Detective's email explaining why the Detective did not believe there was probable cause for an arrest. Doc. 129 at 8-9. But even assuming that there was probable cause to arrest in these instances, Plaintiff

testified that he is not aware of any non-White individuals being charged with a crime by HPD who engaged in conduct similar to Hoefler's. Doc. 150-1 ¶ 43.

Nor is there any evidence that Plaintiff received "harsher treatment" than any other Homewood resident with a loaded firearm threatening to kill someone in front of a police officer. The only negative action Defendants took against Plaintiff was by filing a Clear and Present Danger Report against Plaintiff the day following the incident. As already discussed, Defendants have submitted a race-neutral reason for their filing of the report, and Plaintiff has presented no evidence that this reason was pretextual. Nor has Plaintiff provided any evidence that Defendants file Clear and Present Danger Reports selectively – for example, that they have failed to file a Clear and Present Danger Report in a similar circumstance involving a White resident, or that Black residents are more often the subject of Clear and Present Danger Reports. Plaintiff has thus failed completely to point to any facts from which a reasonable juror could conclude the Clear and Present Danger Report was filed for any non-legitimate reason.

Plaintiff argues that Hoefler is "similarly situated" to Plaintiff, and the differences in treatment the two received proves racial discrimination. Doc. 129 at 13. But based upon the video evidence submitted of the September 25, 2022 incident and the undisputed facts submitted by the parties, no reasonable jury could conclude that Plaintiff and Hoefler were similarly situated. Hoefler was calm throughout the entire event, walked away immediately after police arrived, made no threats to anyone, was not armed, and complied with all police instructions. Plaintiff, meanwhile, exited his house after the police arrived holding a loaded gun, screamed profanities at both Hoefler and Sline, approached Sline while waving his arms and pointing repeatedly in close proximity to Sline, shouted repeated threats to kill Hoefler for several

---

does not present any evidence that the failure to do so was based on the race of the victims. Courts do not infer discrimination simply because people involved in an incident are of a protected class.

minutes after both Sline and Hoefler walked away from Plaintiff, and argued with Sline about his legal right to kill Hoefler. *See* Doc. 119. Plaintiff's argument that "race was the most salient distinguishing factor" between the two men is utterly unpersuasive. Doc. 129 at 14.

Ultimately, Plaintiff provides no evidence of discriminatory intent by any of Defendants.[20] Instead, Plaintiff argues that it is a "classic jury question[]" whether "officers' justifications are credible, whether Plaintiff's race influenced their decisions, and whether a white homeowner would have been treated differently." Doc. 129 at 14. But to survive summary judgment, a Plaintiff must do more than speculate or argue that the defendant should be disbelieved. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) (holding that at summary judgment "it is not sufficient for a plaintiff, who bears the ultimate burden of proof at trial, simply to assert that a jury may disbelieve the defendant."). Plaintiff must point to some fact in the record to show that HPD's non-discriminatory explanations for its actions should not be believed, or that race played a factor in the events of September 25, 2022, or that this event represents a trend of Black citizens being treated differently than White citizens. Plaintiff's subjective belief that these things are true – no matter how strongly held – does not create a genuine dispute of fact for trial. *See Bombliss v. Cnty. of Lee*, 23 F.3d 410 (7th Cir. 1994) (granting a motion to dismiss because plaintiff's feeling of hostility from his neighbor was not sufficient to allege intentional discrimination). For these reasons, summary judgment in favor of defendants on Counts V and IX is appropriate.

**H. Civil Conspiracy Claim (Count VII)**

---

[20] Sline was not involved in any of the previous incidents involving Plaintiff or his family. Doc. 150-1 ¶ 79. Furthermore, the parties agree that Sline "did not see the media coverage concerning Plaintiff's complaint about the 2019 incident and how it was handled." *Id.* ¶ 74. Thus, even if some racial animus could be inferred based upon those events, it could not be attributed to Sline.

The last remaining count is a claim of conspiracy between Sline and Misner to violate Plaintiff's constitutional rights. Doc. 1 ¶¶ 133-140. Given that this Court has already concluded that there is no genuine dispute of fact to support any constitutional violation occurred, this claim begins on tenuous footing. But a conspiracy is simply an agreement to do something improper, and the parties need not carry it out, so the failure of the conspiracy to succeed is not necessarily fatal to a claim. That said, Plaintiff has pointed to no evidence in the record that Sline and Misner agreed to do anything improper. Plaintiff's conspiracy claim is premised on Misner's approval of the Clear and Present Danger Report. But, as already discussed, the undisputed facts establish that the report was non-discretionary, and Plaintiff has provided no evidence that would support an inference that this explanation was pretextual – let alone that Sline and Misner agreed together to perpetrate such pretext. Therefore, this claim too must fail.

## CONCLUSION

For the above stated reasons, Defendants' motion for summary judgment is granted. Defendants' motion to strike is denied.

Dated: April 9, 2026

_____
APRIL M. PERRY
United States District Judge

25